[No. 36814.   Department One.   October 31, 1963.]

JEROME SHULKIN, *Appellant*, v. J. J. ZAPPONE *et al.,*
*Respondents.*\*

*Miracle, Treadwell & Pruzan,* for appellant.

*Clarence M. George,* for respondents.

HALE, J.—This case raises questions of preferences in a
receivership, concerns matters of fiduciary duties of cor-
porate officers, and poses a problem arising from a chattel
mortgage foreclosure. The barest outline of events shows
it to be an appeal on the facts and not on the law.

J. J. Zappone, the sole owner and operator of Zappone
Industries, Inc., in Spokane, manufactured aluminum doors,
screens, windows and similar articles. These he sold at
wholesale and retail. His business was successful and of

\*Reported in 386 P. (2d) 133.

long standing. In November, 1958, he set up a branch office and warehouse in Seattle at 509 Dexter Street. During the operation of his aluminum business, he met Carlton F. Lee, a salesman for a large aluminum manufacturing company. Sometime during the summer of 1958, Lee told Zappone that he had the chance to go into the business of manufacturing aluminum shingles and invited Zappone's participation in the idea. Other than expressing an interest in the project and conferring with Lee several times about it, it does not appear during these casual conversations that Zappone made any contract, express or implied, to engage in business with Lee.

In September, 1958, Lee formed the National Aluminum Company, acquiring 96 of its 100 shares, leaving 4 for qualifying purposes, the total shares having a declared par value of $10,000. He paid for his 96 shares in National Aluminum by transferring to the corporation certain steel dies designed for the manufacture of aluminum shingles at a declared value of $5,000 and placed a value on his promotional activities at an additional sum of $5,000. He commenced doing business in October, 1958, as the National Aluminum Company, using his residence in Bellevue, Washington, as the head office. The following January, 1959, Lee, through National Aluminum Company, rented from Zappone a part of his warehouse space at 509 Dexter in Seattle, meantime retaining his office headquarters in his home in Bellevue. Shortly thereafter, Zappone bought 50 per cent of the shares of National Aluminum Company by paying $10,000 in cash therefor, and he became its vice president and a director of the company.

About one week later, on February 5, 1959, Zappone loaned National Aluminum Company $10,000 in cash on a note conditioned to repayment at the rate of $25 for each square of aluminum shingles sold. Three months later, in May, 1959, Zappone, through his corporation, sold to National Aluminum Company his entire Seattle branch business for $17,500, payments therefor to be at the rate of $500 per month commencing in January, 1960.

Lee made interest payments on the $10,000 note given for the February loan to his company, but Zappone observed that the shingle inventory had been substantially depleted without remittances to him as provided in the note, and, accordingly, he demanded a chattel mortgage to secure the principal of the note. National Aluminum Company met this demand by giving Zappone a chattel morgtage and an assignment of its accounts receivable on January 6, 1960, both as additional security for the note. During the months of January, February and March, 1960, Zappone sold and delivered to National Aluminum on open account some $4,000 worth of materials although he had received no rent for his leased premises at 509 Dexter during the interim.

On April 2, 1960, Lee resigned as an officer and director and turned over the keys, the property, and the business of National Aluminum Company to Zappone.

In the meanwhile, Zappone had received little more than promises on his $10,000 note and the $17,500 purchase price for the sale of his Seattle branch business; nor had he received appropriate payments for the materials sold and delivered by him to National Aluminum Company on open account or for the rental of his premises at 509 Dexter. He moved in on National Aluminum Company on all fronts simultaneously. In April, 1960, he foreclosed his chattel mortgage and bought all of its assets including the aluminum shingle making dies at sheriff's sale; he brought a separate suit for the $17,500 purchase money due in the contract for the sale of his Seattle branch and for goods delivered on consignment but sold without remittances; he garnisheed the corporation bank account.

On May 2, 1960, less than 4 months after the making of the chattel mortgage of January, 1960, Carlton F. Lee filed in the superior court an application for the appointment of a receiver. Plaintiff, appellant here, was appointed.

Plaintiff, as receiver, in his claims says (a) that National Aluminum was insolvent when it made the chattel mortgage on January 6, 1960; (b) that defendant had reasonable grounds to assume it was insolvent; and (c) that the

delivery of it with the subsequent foreclosure was a preference; (d) that the receipt of certain checks by defendant from National Aluminum taking place within 4 months of the receivership likewise was a preference; and (e) that defendant violated his fiduciary duties as an officer and director in foreclosing his mortgage, receiving the preferences, winding up the business affairs of the company and taking possession of the aluminum shingle making dies in the foreclosure proceeding. Defendant denies all of these assertions.

Plaintiff sought to establish his case by presenting the testimony of both Carlton F. Lee and that of defendant Jack Zappone as an adverse witness. He further presented the expert evidence of a certified public accountant in an effort to establish the degree and time of insolvency, and also produced the evidence of a witness who had been both salesman for Zappone and sales manager for Lee. Some 50 separate items of documentary evidence were introduced in plaintiff's case in chief by both parties.

At the close of the plaintiff's case, defendant challenged the sufficiency of the evidence and moved for dismissal. In ruling on the motion, the trial court made a comprehensive analysis of the evidence in an oral summation, had the same filed in the cause as its memorandum opinion, and referred to it in granting the motion and entering an order of dismissal. From the judgment of dismissal, the receiver appeals, urging four separate assignments of error.

These four assignments together raise but one question: Did the plaintiff establish a prima facie case? We describe our role here by borrowing from appellant's brief the statement that, where the trial court held as a matter of law that appellant had not established a prima facie case, this court must determine whether there is sufficient evidence or reasonable inference therefrom, taken in a light most favorable to appellant, to establish a prima facie case for the appellant. *Schmidt v. Pioneer United Dairies*, 60 Wn. (2d) 271, 373 P. (2d) 764. This, then, being an appeal on the facts, our review is perforce a narrow one though based on a study of the whole record.

The following statutes largely govern the conduct of the parties and determine if a prima facie case was made:

"(3) 'Preference' means a judgment procured or suffered against itself by an insolvent corporation or a transfer of any of the property of such corporation, the effect of the enforcement of which judgment or transfer at the time it was procured, suffered, or made, would be to enable any one of the creditors of such corporation to obtain a greater percentage of his debt than any other creditor of the same class;

"(4) 'Insolvent' means, for the purposes of this chapter, a condition whereby the aggregate of a corporation's property, exclusive of any property which it may have conveyed, transferred, concealed, removed or permitted to be concealed or removed, with intent to defraud, hinder, or delay its creditors, shall not at a fair valuation be sufficient in amount to pay its debts." RCW 23.72.010 (3), (4).

"Any preference made or suffered within four months before the date of application for the appointment of a receiver may be avoided and the property or its value recovered by such receiver, if the person receiving the preference or to be benefited thereby or his agent acting therein shall then have reasonable cause to believe that the debtor corporation is insolvent. No preference made or suffered prior to such four months' period may be recovered, and all provisions of law or of the trust fund doctrine permitting recovery of any preference made beyond such four months' period are hereby specifically superseded." RCW 23.72.030.

The receiver strove valiantly to show that the National Aluminum Company was in a state of insolvency on January 6, 1960, when it gave Zappone a chattel mortgage; that Zappone, as a successful businessman, then knew, or as a man of ordinary prudence had reasonable cause to believe, that National Aluminum was insolvent; that the making of the mortgage and its foreclosure constituted a preference; that Zappone assumed control of the company as an officer and director and allowed his own actions at law and equity to prevail against the company by default; that the aluminum shingle dies acquired by defendant under the foreclosure of his chattel mortgage were not in fact subject to the mortgage and, accordingly, that title thereto

did not pass by sheriff's sale. These were the ultimate facts that the receiver sought to show.

We make this study in review, not to decide issues of fact but solely to ascertain if the court granted to plaintiff the benefits of all inferences reasonably favorable to him from the evidence presented by him. And, in making this perusal, we must assume that the trial court had not only the right to weigh the evidence (*Richards v. Kuppinger*, 46 Wn. (2d) 62, 278 P. (2d) 395), but where, as here, the evidence proffered in chief is conflicting, it was bound to do so. If an adverse party is examined extensively in chief, it is not surprising that conflicts will develop within the plaintiff's case, and, where he is thereafter extensively cross-examined by his own counsel, a substantial part of the evidence in defense to the claim will likely be put before the trial court. These conflicts in the evidence in nonjury trials must inevitably be weighed, evaluated and resolved by the trial judge before ruling on the motion for an involuntary nonsuit. Where the testimony of two witnesses is in conflict on a given point, the trial judge, in a nonjury trial, may believe one and doubt the other; the court's determination on conflicting evidence, if supported by substantial evidence, is decisive. *Delegan v. White*, 59 Wn. (2d) 510, 368 P. (2d) 682.

■ The trial court's assessment of the evidence thus may be conveyed into the record by way of its memorandum opinion, and findings of fact and conclusions of law in such circumstances would be considered superfluous. If, then, the trial court, after considering and weighing the whole evidence at the conclusion of the plaintiff's case, makes clear to us its views of the facts by way of a detailed and comprehensive memorandum opinion in ruling upon a challenge to the sufficiency of the evidence and thereby demonstrates that it has accorded to plaintiff all inferences from the evidence reasonably favorable to the plaintiff, we will, on review, accept the memorandum opinion in lieu of formal findings and conclusions.

Although findings of fact and conclusions of law are indicated in nonjury trials to support the judgment on the whole

case, the trial court's memorandum opinion may well do the same thing for us at the end of plaintiff's case. We do not weigh the evidence. We study it to see if the trial court considered it in the light most favorable to the plaintiff and granted to him all inferences which could reasonably be made from it.

Our study of the evidence and the memorandum opinion shows that the trial court fully met this standard. It carefully weighed the evidence, assessed both its corroborative and conflicting effects, granted to the plaintiff all inferences which could reasonably be said to flow from the evidence, and considered it, in our opinion, in a light most favorable to the plaintiff. Our view coincides with that of the trial court; plaintiff did not establish prima facie the facts necessary to sustain the claim.

Judgment of dismissal affirmed.

OTT, C. J., HILL, and HUNTER, JJ., and MURRAY, J. Pro Tem., concur.